IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | | |
|---|---|---|
| DAVID J. REED, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CIVIL ACTION NO. 18-0337-MU |
| | ) | |
| ANDREW M. SAUL, | ) | |
| Commissioner of Social Security,[1] | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff David J. Reed brings this action, pursuant to 42 U.S.C. §§ 405(g) and

1383(c)(3), seeking judicial review of a final decision of the Commissioner of Social

Security ("the Commissioner") denying his claim for a Period of Disability and Disability

Insurance Benefits ("DIB"). The parties have consented to the exercise of jurisdiction by

the Magistrate Judge, pursuant to 28 U.S.C. § 636(c), for all proceedings in this Court.

(Doc. 25 ("In accordance with the provisions of 28 U.S.C. 636(c) and Fed. R. Civ. P. 73,

the parties in this case consent to have a United States Magistrate Judge conduct any

and all proceedings in this case, … order the entry of a final judgment, and conduct all

post-judgment proceedings.")). *See* Doc. 30. Upon consideration of the administrative

---

[1] Andrew M. Saul became the Commissioner of Social Security on June 17, 2019.
Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Saul is substituted for
Nancy Berryhill as the proper defendant in this case.

reSwimcord, Reed's brief, and the Commissioner's brief,[2] it is determined that the

Commissioner's decision denying benefits should be affirmed.[3]

## I. PROCEDURAL HISTORY

On or about February 13, 2017, Reed applied for a Period of Disability and DIB,

under Title II of the Social Security Act, alleging disability beginning on September 21,

2009. (Tr. 160-64). His application was denied at the initial level of administrative review

on June 16, 2017. (Tr. 102-06). On June 28, 2017, Reed requested a hearing by an

Administrative Law Judge (ALJ). (Tr. 109-10). On or about October 4, 2017, Reed

submitted a statement amending his alleged onset date to March 19, 2015. (Tr. 204).

After a hearing was held on December 6, 2017 (Tr. 2731-59), the ALJ issued an

unfavorable decision finding that Reed was not under a disability from the alleged onset

date of his disability through the date of the decision, April 5, 2018. (Tr. 15-41). Reed

appealed the ALJ's decision to the Appeals Council, which denied his request for review

on June 19, 2018. (Tr. 1-5).

After exhausting his administrative remedies, Reed sought judicial review in this

Court, pursuant to 42 U.S.C. §§ 405(g) and 1383(c). (Doc. 1). The Commissioner filed

an answer and the social security transcript on November 5, 2018. (Docs. 10, 11). This

transcript was subsequently stricken and both a modified transcript and a supplemental

transcript were filed in its place. (Docs. 17-1 & 17-2). Both parties filed briefs setting

forth their respective positions. (Docs. 20, 22). The case is now ripe for decision.

---

[2] The parties elected to waive oral argument. *See* Docs. 28, 29.
[3] Any appeal taken from this Order and Judgment shall be made to the Eleventh Circuit Court of Appeals. *See* Doc. 25. ("An appeal from a judgment entered by a Magistrate Judge shall be taken directly to the United States Court of Appeals for the judicial circuit in the same manner as an appeal from any other judgment of this district court.").

## II. CLAIMS ON APPEAL

Reed alleges that the ALJ's decision to deny him benefits is in error for the following reasons:

1. The ALJ erred by failing to find Reed's PTSD, depressive disorder, anxiety disorder, and degenerative joint disease (DJD) in the right shoulder to be severe impairments; and

2. The ALJ's Residual Functional Capacity (RFC) determination was not supported by substantial evidence.

(Doc. 20 at pp. 1-2).

## III. BACKGROUND FACTS

Reed was born on March 20, 1965 and was almost 52 years old at the time he filed his claim for benefits. (Tr. 160, 221). Reed initially alleged disability due to a left shoulder injury while on active duty in the Army, sciatica, and nerve damage in his right arm. (Tr. 225). Reed completed two years of college in 2001, and he received specialized training as a military medic in 1987 and again in 2008. (Tr. 226). He has worked in the past as a combat medic in the Army, a lab assistant, a phlebotomist, and an apartment maintenance technician, but he has not worked since his alleged onset date. (Tr. 226, 235). He indicated that he generally engages in normal daily activities; such as, personal care, some driving, light housework, food preparation, shopping, paperwork, reading his Bible, conversing with family and friends, and watching television. (Tr. 243-47). He testified that he attends church twice per week and enjoys volunteering at church and with the VA. (Tr. 2751-53). He reported that his memory has been hampered and his hearing and lung capacity reduced since his combat injury. (Tr.

248). Reed alleged that he is unable to work due to physical problems associated with his left shoulder, his reduced breathing, and his back and because he suffers from PTSD. (Tr. 2741-48).

## IV. ALJ'S DECISION

After conducting a hearing on this matter, the ALJ made a determination that Reed had not been under a disability during the relevant time period, and thus, was not entitled to benefits. (Tr. 15-41). The findings set forth by the ALJ in her April 5, 2018 decision that are relevant to the claims on appeal are set forth below.

## V. DISCUSSION

Eligibility for a Period of Disability and DIB requires that the claimant be disabled. 42 U.S.C. § 423(a)(1)(E). A claimant is disabled if the claimant is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). The impairment must be severe, making the claimant unable to do the claimant's previous work or any other substantial gainful activity that exists in the national economy. 42 U.S.C. § 423(d)(2); 20 C.F.R. §§ 404.1505-11. "Substantial gainful activity means work that … [i]nvolves doing significant and productive physical or mental duties [that] [i]s done (or intended) for pay or profit." 20 C.F.R. § 404.1510.

In all Social Security cases, an ALJ utilizes a five-step sequential evaluation in determining whether the claimant is disabled:

> (1) whether the claimant is engaged in substantial gainful activity; (2) if not, whether the claimant has a severe impairment; (3) if so, whether the severe impairment meets or equals an impairment in the Listing of Impairment in the regulations; (4) if not, whether the claimant has the

RFC to perform her past relevant work; and (5) if not, whether, in light of the claimant's RFC, age, education and work experience, there are other jobs the claimant can perform.

*Watkins v. Comm'r of Soc. Sec.,* 457 F. App'x 868, 870 (11th Cir. 2012) (per curiam) (citing 20 C.F.R. §§ 404.1520(a)(4), (c)-(f), 416.920(a)(4), (c)(f); *Phillips v. Barnhart,* 357 F.3d 1232, 1237 (11th Cir. 2004)) (footnote omitted). The claimant bears the burden of proving the first four steps, and if the claimant does so, the burden shifts to the Commissioner to prove the fifth step. *Jones v. Apfel*, 190 F.3d 1224, 1228 (11th Cir. 1999).

If the claimant appeals an unfavorable ALJ decision, the reviewing court must determine whether the Commissioner's decision to deny benefits was "supported by substantial evidence and based on proper legal standards." *Winschel v. Comm'r of Soc. Sec.,* 631 F.3d 1176, 1178 (11th Cir. 2011) (citations omitted); *see* 42 U.S.C. § 405(g). "Substantial evidence is more than a scintilla and is such relevant evidence as a reasonable person would accept as adequate to support a conclusion." *Winschel*, 631 F.3d at 1178 (citations omitted). "In determining whether substantial evidence exists, [the reviewing court] must view the record as a whole, taking into account evidence favorable as well as unfavorable to the [Commissioner's] decision." *Chester v. Bowen*, 792 F.2d 129, 131 (11th Cir. 1986). The reviewing court "may not decide the facts anew, reweigh the evidence, or substitute [its] judgment for that of the [Commissioner]." *Id*. When a decision is supported by substantial evidence, the reviewing court must affirm "[e]ven if [the court] find[s] that the evidence preponderates against the Secretary's decision." *MacGregor v. Bowen*, 786 F.2d 1050, 1053 (11th Cir. 1986).

As set forth above, Reed has asserted two grounds in support of his argument that the Commissioner's decision to deny him benefits is in error: (1) the ALJ erred by failing to find PTSD, depressive disorder, anxiety disorder, and degenerative joint disease (DJD) in the right shoulder to be severe impairments and (2) the ALJ's Residual Functional Capacity (RFC) determination was not supported by substantial evidence. (Doc. 20 at pp. 1-2).

A. **Whether ALJ's Determination that PTSD, Depressive Disorder, Anxiety Disorder, and Mild DJD Were Not Severe Impairments Was in Error**

Reed contends that the ALJ erred in failing to find that his PTSD, depressive disorder, anxiety disorder, and mild DJD in his right shoulder are severe impairments as defined by the applicable social security regulations. (Doc. 20 at pp. 2-5). The ALJ did analyze these impairments and determined that they were non-severe impairments. (Tr. 18.) The Commissioner argues that the issue of whether these impairments were properly classified is not relevant here because the ALJ did find that Reed had other severe impairments at step two and, thus, continued on with the sequential evaluation process. (Doc. 22 at p. 3). The Commissioner further asserts that, in assessing Reed's RFC, the ALJ properly considered the limitations established by the medical evidence, whether they arose from severe or non-severe impairments, as required by 20 C.F.R. §§ 404.1545 and 416.945; therefore, the ALJ did not reversibly err. (*Id.* at p. 4).

A severe impairment is an impairment or combination of impairments that significantly limits the claimant's physical or mental ability to do basic work activities. 20 C.F.R. § 404.1520(c). The Commissioner's regulations define basic work activities as the abilities and aptitudes to do most jobs and, in analyzing step two of the sequential evaluation process, the Commissioner considers a claimant's "(1) Physical functions

6

such as walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling; (2) Capacities for seeing, hearing, and speaking; (3) Understanding, carrying out, and remembering simple instructions; (4) Use of judgment; (5) Responding appropriately to supervision, co-workers and usual work situations; and (6) Dealing with changes in a routine work setting." 20 C.F.R. § 404.1522(b). "Step two is a threshold inquiry." *McDaniel v. Bowen,* 800 F.2d 1026, 1031 (11th Cir. 1986). Only claims based on the most trivial impairments may be rejected, and an impairment is not severe only if the abnormality is so slight and its effect so minimal that it would clearly not be expected to interfere with the individual's ability to work. *Id.* A claimant need only demonstrate that her impairment is not so slight and its effect not so minimal. *Id.*

In this case, the ALJ concluded that Reed's PTSD, depressive disorder, anxiety disorder and mild DJD in the right shoulder were non-severe (Tr. 18). Reed argues that substantial evidence does not support the ALJ's step two finding in this regard; however, even if the Court agreed with Reed on this point, the law in this Circuit dictates that he would not be entitled to a remand of this action on this ground. The Eleventh Circuit has consistently held that when the ALJ finds at least one severe impairment and then gives full consideration to the consequences of all of the claimant's impairments, in combination, at later stages of the analysis, any error at step two is harmless and is not cause for reversal. *See Hearn v. Comm'r, Soc. Sec. Admin.,* 619 F. App'x 892, 895 (11th Cir. 2015) (finding any step two error harmless where the ALJ "properly noted that he considered [the claimant's] impairments in the later steps [of the sequential evaluation process]"); *Tuggerson-Brown v. Comm'r of Soc. Sec.,* 572 F. App'x 949, 951 (11th Cir. 2014) (holding that "we have recognized that step two requires only a finding

of 'at least one' severe impairment to continue to the later steps" and recognizing that

the ALJ is "required to consider all impairments, regardless of severity, in conjunction

with one another in performing the latter steps of the sequential evaluation [process]");

*Gray v. Comm'r of Soc. Sec.,* 550 F. App'x 850, 853-54 (11th Cir. 2013) ("Here, we

need not consider whether substantial evidence supports the ALJ's conclusion at step

two—that Gray's cervical spine impairment was not a severe impairment—because

even if there was error, it would be harmless. In assessing Gray's RFC, the ALJ found

that Gray had severe impairments and that the step two test was satisfied, and then

specifically considered and discussed the symptoms that Gray alleged stemmed from a

cervical spine impairment elsewhere in the five-step sequential process.... The ALJ thus

performed the analysis that would have been required had he determined a cervical

spine impairment was severe at step two.").

 In this case, the ALJ did find that Reed had severe impairments at step two, Tr.

17 ("**The claimant has the following severe impairments: left shoulder**

**dysfunction, status post multiple surgeries; restrictive airway disease (RAD);**

**degenerative disc disease; bilateral sensorineural hearing loss with tinnitus….**),

and continued with an in depth analysis of all of Reed's medical records discussing both

the severe and non-severe impairments. Tr. 18-39. The ALJ specifically "considered the

limiting effects of all of the claimant's medically determinable impairments, including

those that are not 'severe,' … when assessing the claimant's residual functional

capacity". Tr. 18. The law is clear that this Court need not consider whether substantial

evidence supports the ALJ's step two decision - that Reed's PTSD, depressive disorder,

anxiety disorder and mild DJD in the right shoulder are not severe impairments -

because any error in this regard is harmless since the ALJ did identify other severe

impairments and proceeded to the remaining steps in the sequential evaluation process,

giving full consideration to the consequences of all of Reed's impairments (both severe

and non-severe) on his ability to work.

In particular, this Court finds that the following demonstrates that the ALJ

considered all of Reed's impairments, including his non-severe ones, in reaching the

ultimate conclusion that Reed is not disabled under the Social Security Act:

> The claimant also has the following non-severe impairments, which when considered singly and in combination, do not cause more than a minimal limitation in the ability to perform basic work activity: posttraumatic stress disorder (PTSD); depressive disorder; anxiety disorder; alcohol use disorder; mild degenerative joint disease (DJD) in the right shoulder; …. (Exhibits 2A, 6D, 2F, 5F, 6F and 17F).

> **While the physical impairments discussed below are non-severe, the undersigned has considered the limiting effects of all of the claimant's medically determinable impairments, including those that are not "severe,"' as explained in 20 CFR 404.1520(c), 404.1521 and 404.1523, when assessing the claimant's residual functional capacity** (20 CFR 404.1545(a)(2) and 404.1545(e)).

> In terms of the right shoulder, the May 24, 2016, Compensation and Pension (C&P) exam performed by Nelia Gonyer, ARNP, noted the claimant was able to perform repetitive testing and there was no additional functional loss or range of motion after three repetitions in the right shoulder. Pain, weakness, fatigability or incoordination do not significantly limit functional ability with repeated use over a period of time. The claimant had 5/5 strength. Ms. Gonyer said the claimant's right shoulder condition does not cause functional impairment that is attributable to his ability to perform physical and sedentary type occupation. There is no impairment noted caused by the right shoulder. (Exhibit 2F/ 105-110).

> On May 16, 2017, Cynthia Washington, CRNP, completed a Disability Benefits Questionnaire (DBQ) addressing the claimant's Shoulder and Arm Conditions. Ms. Washington noted the claimant has a diagnosis of chronic right shoulder sprain. He demonstrated reduced range of motion on exam, tenderness to palpation, and 4/5 strength. In terms of functional impact, Ms. Washington

noted the claimant reported pain, stiffness, limited mobility, popping of right shoulder, weakness, fatigue and lack of endurance. His condition interferes with his ability to lift, carry, and hold heavy objects. (Exhibit 16F).

However, the undersigned finds the claimant's right shoulder impairment is non-severe, as the claimant has had no significant treatment for his right shoulder during the period at issue and x-rays have showed no more than mild abnormalities. X-rays of the right shoulder on May 22, 2015 showed calcific tendinitis and very mild degenerative arthritic changes at the acromioclavicular (AC) joint. (Exhibit 2F/103, 431). The March 29, 2017 right shoulder x-rays showed mild degenerative spurring in the AC joint. (Exhibit 5F/4). Other physical exams of record note normal range of motion and 5/5 strength in the right shoulder. (Exhibits 2F/104, 107, 316 and 6F).

* * *

The claimant's medically determinable mental impairments, considered singly and in combination, do not cause more than minimal limitation in the claimant's ability to perform basic mental work activities and are therefore nonsevere.

In May 2017, Harold R. Veits, M.D., a State agency psychiatric consultant, found the claimant's medically determinable depressive and alcohol addiction disorder were non-severe and the claimant's trauma and stressor related disorder was severe. Dr. Veits found the claimant would have mild limitation in understanding, remembering, or applying information; moderate limitation in interacting with others; mild limitation in concentrating, persisting, or maintaining pace; and moderate limitation in adapting or managing oneself (Exhibit 2A).

However, Dr. Veits noted treatment for PTSD was newly initiated and the condition was likely to improve over the next 6-12 months with ongoing mental health care. Indeed, as explained herein, there is no persuasive evidence of greater than mild functional limitation lasting or expected to last any 12 continuous months.

* * *

The record shows no significant mental health history prior to the amended alleged onset date. For example, the claimant's case manager noted a diagnostic history of depression during active duty in 2011. (Exhibit 2F). However, in February 2011, the claimant was evaluated by Joycelyn Vanterpool, M.D., who found no psychiatric diagnoses. (Exhibit IF/143-144, 1188). The VA records also show a diagnosis of opioid dependence that was in remission in July 2011. (Exhibit IF/629, 636). Indeed, the claimant's first medically determinable mental impairment diagnosed by an acceptable medical

source is more than a year after his March 19, 2015, alleged onset date.

The Mental Health Initial Evaluation Note from March 31, 2016, by Gissa Hernandez Infante, LCSW, noted he entered treatment on October 12, 2015, and his only diagnosis was "Other Unspecified Counseling." He is prescribed medications for sleep. His reported issues are housing and finances, not depressive or anxiety related symptoms. (Exhibit 2F/l53-l54). On January 5, 2016, the claimant told his case manager that he would be volunteering at Lee County Healthcare Center. He said he needs to feel productive and volunteering would offer him a good experience helping others. (Exhibit 2F/173).

The claimant underwent a neuropsychological consult with Manuel Chaknis, Ph.D., on May 3, 2016. Prior to this date, he received case management services related to housing and financial issues but had no mental diagnosis. After this exam, he still had no mental medically determinable impairment. Dr. Chaknis noted the claimant requested a neuropsychological evaluation and testing for worsening memory issues that he thought may be due to his medications. He reported making poor decisions in that his separation monies from the military are gone and he has little to show for it. Dr. Chaknis administered diagnostic testing, which indicated uniformly average and above average scores in all assessed domains. No cognitive diagnostic impression was offered. The claimant denied items associated with significant depression on the BDI-2 (raw score 9) and anxiety on the BAI (raw score 2). The claimant's stressors included health, unresolved service-connected disability status, homelessness, "prior" issues with significant other, finances and the timing of a recent visit with adult daughter and her child. Dr. Chaknis stated, "Nonetheless, he is denying any enduring distress both on interview and self-report measures." (Exhibit 2F/116-122). Great weight is given to Dr. Chaknis's assessment that, as of May 2016, the claimant had no mental medically determinable impairment, which is consistent with objective and subjective evidence.

The claimant underwent a psychology consult with Julie Wilson, Psy.D., on June 7, 2016. Issues reported were a sleep problem, nightmares, anger, and relationship with his fiancee, which has been on and off for about ten years. He had a normal mental status exam. He reported he wants to go back to school, as he has completed 2 years of college courses and was pre-med initially. Dr. Wilson assessed the claimant with insomnia, improving with sleep hygiene, but did not

provide a psychiatric diagnosis. She suggested tracking nightmares/worries that are keeping him up. (Exhibit 2F/90, 330-335). The claimant also told Dr. Wilson that he was planning to go back to work if he can find something that does not aggravate his shoulder injury. He was working as a phlebotomist but had to push carts. (Exhibit 2F/88). The claimant did not mention any work related functional difficulty with this job except for pushing carts, which generally supports the finding that the claimant's mental impairments are not severe.

Meanwhile, the claimant continued to follow the process for employment in the VA. On July 12, 2016, the claimant told his case manager that he was hired as a bus attendant and would begin training soon. (Exhibit 2F/78).

The claimant saw Dr. Wilson on July 20, 2016 for anger issues/relationship problems…. Dr. Wilson said the claimant does have some PTSD symptoms but the primary concern was relationship issues at present…. Dr. Wilson assessed the claimant with "partner relationship problems – needs couples therapy primarily but individual to address personal issues." She also assessed him with alcohol use disorder, mild and PTSD symptoms. (Exhibit 2F/75). No medication was prescribed for PTSD symptoms at that time.

On September 16, 2016, the claimant had an individual therapy session with Dr. Wilson. He reported he was having increased depression and psychosocial stress. He said he drank alcohol "heavily" when his wife left and then returned. He was now trying to drink less alcohol, limiting himself to one drink when they go out or in one sitting. His mood was dysphoric and affect was somewhat blunted, but his attention, concentration, memory and thought process was normal. Dr. Wilson assessed the claimant with partner relationship problems; alcohol use disorder moderate (contributing to relationship issues), having difficulties cutting back; unspecified depressive disorder, and PTSD symptoms. (Exhibit 2F/47).

On October 4, 2016, the claimant told Dr. Wilson during group therapy that he was anxious about a job interview. He said he has "never had so much trouble getting a job before in his life." (Exhibit 2F/45). On October 19, 2016, the claimant told Ms. Hernandez that he was making efforts to reenlist in the National Guard and was in need of a physical exam…. (Exhibit 2F/43).

The more recent VA records reflect improvement in the depressive and PTSD symptoms previously reported. The March 10, 2017, progress note shows zero scores on both the depression screening and PTSD screening test, indicative of no symptoms related to these conditions. (Exhibit 3F/22-23 and 5F/75, 77). The March 25, 2017, review of systems was negative for behavioral problems and confusion. The claimant was not nervous or anxious. (Exhibit 17F/33). On April 1, 2017, the claimant's mood, affect, behavior, judgment, and thought content were normal. (Exhibit 17F/10-12).

On April 14, 2017, a mental health crisis intervention note indicated the claimant was recently married and reported anger issues/hostility toward his wife. The note indicated the claimant's wife is safe, and the claimant has reduced alcohol intake. The claimant said he has fishing, bike riding, the gymnasium, spending time with his wife, and church to occupy his time. (Exhibit 5F/44). The screening scores included a PHQ-9 score of 7 (mild depressive symptoms); a GAD- 7 score of 6 (mild anxiety symptoms); and a PCL-5 score of 46 regarding PTSD symptoms. (Exhibit 5F/50-52).

Also on April 14, 2017, the claimant underwent a mental health initial intake evaluation for anger problems with Michael Carlton, Ph.D. He reported he last used alcohol two days prior. The claimant's strengths were "my determination, will power, my sense of right and wrong, my loyalty, good sense of humor." His concerns/needs included, "I'm working on not worrying." On mental status exam, his mood was "Exciting, we just got married, I love her so much." His affect was broad congruent to topic. Concentration, attention, judgment, and insight were all grossly intact. Dr. Carlton diagnosed the claimant with anxiety disorder. (Exhibit SF/45-48).

The claimant underwent a consultative psychological exam with Jessica Shenesey, Ph.D., on April 27, 2017. The claimant reported he was diagnosed with PSTD in 2017 due to previous military combat. Symptoms include nightmares, crying spells, flashbacks, nervousness in crowds, difficulty sitting with his back to a door, and anxiety. He stated his occupational functioning is affected by physical and mental limitations. He reported no additional life stress. He receives outpatient mental health treatment at the VA clinic weekly…. (Exhibit 4F).

…. The claimant's interaction with staff and Dr. Shenesey was satisfactory. The claimant had normal speech and communication. He presented with euthymic mood with congruent and full affect. No difficulty in initiating, sustaining, or terminating emotional responses

was observed. Emotional responses were appropriate to the thought, content, and situation. The claimant was oriented to person, place and time. In terms of concentration/attention, the claimant was able to handle Serial 7's without difficulty. He was able to make change, do simple arithmetic, count backward from 20 to 1 and spell "world" backward. There were no indications of deficits in his overall concentration or attention. His memory was intact. Dr. Shenesey noted there were no indications of hallucinations, delusions, or other circumstances of perceptual disturbance. He displayed no distortions, ideas of reference, depersonalization, doubting, indecision, grandiosity, unworthiness, helplessness, hopelessness, or paranoid ideations. He also displayed no preoccupations, obsessions, phobias, ruminations, or somatization. The claimant denies suicidal or homicidal ideation. Judgment and insight were fair. His intellectual level is estimated to be in the Average range. (Exhibit 4F).

In terms of daily activities, the claimant lives in his own home with his wife and stepdaughter. He gets up at various times and reported difficulty initiating and maintaining sleep. He spends the day attending appointments and going to the library. He enjoys fishing. He stated he helps his wife with domestics of the home. He has difficulty with personal hygiene such as dressing due to limited mobility rather than mental problems. The claimant reported a change in his ability to perform and enjoy daily activities due to PTSD and physical limitations. He reported some strained interpersonal relationships. (Exhibit 4F).

Dr. Shenesey's diagnostic impression was unspecified depressive disorder and PTSD. She said the claimant's prognosis is guarded, but noted it is reasonable to expect some improved mental health functioning with consistent treatment within the next six to twelve months. Dr. Shenesey said the claimant's ability to understand, remember and carry out complex instructions, and make judgments on complex work-related decisions is fair. The claimant's ability to interact appropriately with the public, supervisors and co-workers and to respond appropriately to usual work situations and to changes in routine settings is fair. (Exhibit 4F).

A May 26, 2017, psychology note provided by Susan Rhodes, a psychologist, noted the claimant presented for psychotherapy. He reported using alcohol fairly heavily in the past but now has about one beer per week. He reported noticing a dependence of prescribed narcotic pain medication, so he stopped taking them and now only takes Tramadol as needed. He has earned an Associate's degree and is currently working on a Bachelor's degree. He hopes to go to school

to become a physician's assistant. He was referred to vocational rehabilitation for assistance. He and wife were interested in couple's therapy. The mental status exam was normal except stated mood is irritable and depressed with constricted affect. Dr. Rhodes assessed the claimant with PTSD. (Exhibit 19F/67-68).

On May 8, 2017, the claimant had his first visit with Gregory Cummings, a psychiatrist. He reported he struggles with sleep issues that go back to when he was injured in Iraq in 2009. He recently married, but continues to have problems with chronic pain, insomnia, irritability, depression and mood swings that occur for reasons that are often unknown. The claimant attended an anger management group at the Cape Coral VA in 2016 after he was seen by a psychologist. e said he would like to receive further mental health treatment from the VA now that he has moved to this area. They discussed a medication trial with Remeron (Mirtazapine) 15 mg to help with his symptoms of depression and insomnia associated with his history of having PTSD. He reported consuming 1-2 drinks per month. The mental status exam was normal. Dr. Cummings diagnosed the claimant with PTSD, chronic; depressive disorder, unspecified; and anxiety disorder not otherwise specified (NOS). He started the claimant on Mirtazapine 15 mg for PTSD/depression/anxiety/sleep. (Exhibit 19F/73-80).

On June 22, 2017, the claimant saw Dr. Cummings for follow up. Dr. Cummings noted he was taking Mirtazapine 15 mg but he had to discontinue the medication because of daytime sedation. They discussed a trial of Cymbalta to help with depression, anxiety, and pain. The mental status exam was normal. (Exhibit 19F/50-54). On July 11, 2017, Dr. Rhodes saw the claimant and his wife for couple's therapy. The claimant admitted he has a hard time being home and not working. Dr. Rhodes noted he has enrolled in school and is hoping this helps with the adjustment. (Exhibit 19F/46). At couple's therapy on July 25, 2017, Dr. Rhodes noted the claimant acknowledged that he does not have enough interests and relies heavily on his wife while she has a full life with work and friends, family, etc. He said he plans to return to school next semester and hopes this fills some of the void in his life.(Exhibit 19F/40).

On August 22, 2017, the claimant told Dr. Cummings that Cymbalta helps with mood and pain. He denied side effects and reported he was doing "alright." The claimant wanted to continue with Cymbalta because he feels it has helped with his mood and chronic pain symptoms. The mental status exam was normal. (Exhibit 19F/27-30). The claimant was a no show for his psychotherapy appointment with

Dr. Rhodes on October 2, 2017. He said they had to reschedule the appointments to after 1:00 p.m. because it conflicted with his new class schedule. (Exhibit 19F/17).

Overall, the claimant's educational and vocational plans and goals support the finding that the claimant's mental impairments are not severe. There is no persuasive evidence of greater than mild functional limitation lasting or expected to last any 12 continuous months.

* * *

The claimant's activities of daily living, educational and vocational goals support the finding that the claimant's mental impairments are not severe. For example, VA records note the claimant expressed interest in going back to work, participated in vocational assistance through the VA, and returned to take a class. The claimant reported adjustment issues related to being home and not working. In January 2016, the claimant was going to volunteer at a local healthcare center and reported he wanted to feel productive and to help others. (Exhibit 2F/173). In June 2016, he reported he wanted to go back to work if he could find a job that did not aggravate his shoulder injury. He did not mention any difficulty with his job as a phlebotomist except pushing carts, which supports finding no severe mental impairments that would impact his ability to work. (Exhibit 2F/88). The claimant also reported in October 2016 that he was making efforts to re-enlist in the National Guard and he may need a waiver for his physical service-connected conditions. This plan suggests he felt physically and mentally capable of working. (Exhibit 2F/43).

Dr. Wilson noted the claimant had some PTSD symptoms in July 2016, but the claimant's primary concern when presenting for treatment was relationship issues with his fiancee. (Exhibit 2F/75). He was later diagnosed with his first mental medically determinable impairment in April 2017 by Dr. Carlton and was not prescribed psychotropic medication until May 2017. (Exhibits 5F/48 and 19F/73-80). In April 2017, the claimant also reported he has fishing, bike riding, the gymnasium, spending time with his wife, and church to occupy his time. (Exhibit 5F/44). The claimant has since enrolled in school. (Exhibit 19F/17). The claimant's reported activities of daily living and the statements by the claimant's sister in Exhibit 8E support a finding that mental complaints are not severe.

(Tr. 18, 20-24, 26) (emphasis added).

Based on the foregoing, this Court finds no reversible error with respect to the

ALJ's conclusion that Reed's PTSD, depressive disorder, anxiety disorder and mild DJD

in the right shoulder are not severe impairments. The record demonstrates that the ALJ

properly considered all of his impairments, including those she found to be non-severe,

in determining his RFC and reaching the conclusion that he was not disabled. *See, e.g.,*

*Tuggerson-Brown,* 572 F. App'x at 952.

## B. Whether ALJ's RFC Determination Was Supported by Substantial Evidence

Reed asserts that, because the ALJ did not take into consideration limitations

related to his PTSD, depressive disorder, anxiety disorder, and mild DJD in the right

shoulder, the ALJ's RFC assessment is not supported by substantial evidence. Reed

argues that the ALJ's RFC is not supported by substantial evidence, is contrary to his

treatment records, and "essentially substituted the ALJ's own medical opinion." (Doc. 20

at pp. 6-7). Conversely, the Commissioner asserts that, because Reed makes no

specific assertion of error in the ALJ's RFC assessment, his argument is simply a

request that the Court reweigh the evidence. (Doc. 22 at p. 7). After reviewing and

weighing the medical evidence, the Function Reports completed by Reed and his sister,

and the other evidence of record, the ALJ found him to have the RFC to perform a

reduced range of light work, with certain limitations, set forth as follows:

> **occasional climbing, stooping, kneeling crouching, and crawling; occasional pushing/pulling; no overhead reaching with left upper extremity; frequent reaching front and laterally with left upper extremity; occasional exposure to dust, fumes, odors, gases and poor ventilation; and no exposure to loud noise.**

 (Tr. 28).

A claimant's RFC is "an assessment of an individual's ability to do sustained

work-related physical and mental activities in a work setting on a regular and continuing

basis." SSR 96-8p, 1996 WL 374184, at *1. It is an "administrative assessment of the

extent to which an individual's medically determinable impairment(s), including any related symptoms, such as pain, may cause physical or mental limitations or restrictions that may affect his or her capacity to do work-related physical and mental activities." SSR 96-8p, 1996 WL 374184, at *2. It represents **the most, not the least**, a claimant can still do despite his or her limitations. 20 C.F.R. § 404.1545; SSR 96-8p, 1996 WL 374184, at *2 (emphasis added). The RFC assessment is based on "all of the relevant medical **and other evidence**." 20 C.F.R. § 404.1545(a)(3). In assessing a claimant's RFC, the ALJ must consider only limitations and restrictions attributable to medically determinable impairments, i.e., those that are demonstrable by objective medical evidence. SSR 96-8p, 1996 WL 374184, at *2. Similarly, if the evidence does not show a limitation or restriction of a specific functional capacity, the ALJ should consider the claimant to have no limitation with respect to that functional capacity. Id. at *3. The ALJ is **exclusively** responsible for determining an individual's RFC. 20 C.F.R. § 404.1546(c).

It is well-settled that the ultimate responsibility for determining a claimant's RFC, in light of the evidence presented, is reserved to the ALJ, not to the claimant's physicians or other experts. *See* 20 C.F.R. § 404.1546. "[T]he ALJ will evaluate a [physician's] statement [concerning a claimant's capabilities] in light of the other evidence presented and the ultimate determination of disability is reserved for the ALJ." *Green v. Soc. Sec. Admin.,* 223 F. App'x 915, 923 (11th Cir. 2007); *see also Pritchett v. Colvin,* Civ. A. No. 12-0768-M, 2013 WL 3894960, at *5 (S.D. Ala. July 29, 2013) (holding that "the ALJ is responsible for determining a claimant's RFC"). "To find that an ALJ's RFC determination is supported by substantial evidence, it must be shown that

the ALJ has 'provide[d] a sufficient rationale to link' substantial record evidence 'to the legal conclusions reached.'" *Jones v. Colvin*, CA 14-00247-C, 2015 WL 5737156, at *23 (S.D. Ala. Sept. 30, 2015) (quoting *Ricks v. Astrue*, No. 3:10-cv-975-TEM, 2012 WL 1020428, at *9 (M.D. Fla. Mar. 27, 2012) (internal quotation marks and citations omitted)).

A review of the entire record reveals that the ALJ was presented with a multitude of medical evidence. In this case, the ALJ discussed the medical evidence in detail, including the weight accorded to the medical opinion evidence and the grounds therefor. The ALJ also described the information provided by Reed in his Function Report and at the hearing concerning his limitations and activities and the information provided by his sister in the Third-Party Function Report that she completed. The ALJ made reference to the medical findings, as well as other evidence, in assigning additional limitations to Reed's RFC light duty status. *See* Tr. 30; *see also* Tr. 29-36. Having reviewed the evidence and considered the arguments made by Reed and being mindful of the admonishment that the reviewing court may not reweigh the evidence or substitute its judgment for that of the Commissioner, the Court finds that the RFC assessment made by the ALJ was supported by substantial evidence.

## CONCLUSION

In light of the foregoing, it is **ORDERED** that the decision of the Commissioner of Social Security denying Plaintiff benefits be **AFFIRMED**.

**DONE** and **ORDERED** this the **25th** day of **September, 2019**.

s/P. BRADLEY MURRAY
**UNITED STATES MAGISTRATE JUDGE**